# **EXHIBIT 5**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COACH, INC. and COACH
SERVICES, INC.,

      Plaintiffs,

  vs.                  Case No.
                          13-cv-7165(SDY)

DI DA IMPORT AND EXPORT INC.
(d/b/a DI DA NEW YORK),

      Defendant.
-----------------------------)

Volume I

VIDEOTAPED DEPOSITION OF AMY XU SHI

New York, New York

Friday, August 22, 2014

Reported by:
SHAUNA STOLTZ-LAURIE, RPR, CLR
CSR NO. 810490
JOB NO. 12372

Page 2

```
 1
 2
 3
 4
 5                    August 22, 2014
 6                     9:28 a.m.
 7
 8         Videotaped deposition of AMY XU
 9    SHI, held at the offices of Bryan Cave
10    LLP, 1290 Avenue of the Americas, New
11    York, New York, pursuant to 30(b)(6)
12    Notice and Subpoena, before Shauna
13    Stoltz-Laurie,  Registered Professional
14    Reporter, Certified Realtime Reporter,
15    and a Notary Public of the State of New
16    York.
17
18
19
20
21
22
23
24
25
```

1          Shi
2     Q.   And you don't know who prepared the
3  2011 and the 2012 tax returns; is that
4  correct?
5     A.   I don't know the firm name.
6     Q.   Correct?
7     A.   Yeah.
8          No.
9     Q.   Okay.  Do you know the firm name,
10 or not?
11    A.   No.
12    Q.   Did you do anything in preparation
13 for your deposition today to review or
14 determine the name of the accounting firm for
15 2011 and 2012?
16    A.   No.
17    Q.   Did you review any financial
18 statements or reports in preparation for your
19 deposition today?
20    A.   No.
21    Q.   Okay.  Let's go back to 2011.
22    A.   Hm.
23    Q.   Did Di Da make a profit in 2011?
24    A.   No.
25    Q.   How do you know that?

Page 76

1  Shi

2  A.  Because when my mom gave out
3  checks, there's almost zero balance in the
4  account.  We're -- it's a very hard time, so
5  I -- I know we're definitely not making
6  money.
7  Q.  Okay.  If there's a zero balance or
8  close to a zero balance in a checking
9  account, does that mean that a company's not
10  making money?
11  A.  Also, the sales is -- the expense
12  is always higher than the sales.
13  MR. McKEY:  Could you read back my
14  last question.
15  (Record read, as follows:
16  "If there's a zero balance or close
17  to a zero balance in a checking account,
18  does that mean that a company's not
19  making money?")
20  A.  Yes.
21  Q.  It does.
22  A.  Yes.
23  Q.  Okay.  That's interesting.
24  What were Di Da's expenses in 2011?
25  A.  Rent --

Page 129

1    Shi

2    Q.   "Yes" what?

3    A.   Oh.  If he paid the factory in
4    cash?  That I -- I -- I don't know.  It could
5    be cash or wire transfer.

6    Q.   Wire transfer from where?

7    A.   From -- we also pay to China, too.
8    Some parts of the money, we always wire from
9    U.S. to China, and then he will be the one
10   who decide this money goes to the freight
11   company or this money goes to the factory.
12   And then on the side, he has his own saving,
13   too, to pay when we are unable to have cash
14   flow here, so he will pay to China.

15   Q.   Sometimes Long Zhu would pay in
16   cash in China.

17   A.   Yes.

18   Q.   Would he also sometimes pay via
19   wire transfer from his own accounts in China?

20   A.   That I -- I'm not sure.  I don't
21   know.

22   Q.   So you're not entirely certain how
23   the factory was paid to produce products
24   bearing the marks at issue in this
25   litigation; is that correct?

1           Shi
2      A.   Oh, yeah.
3           (Record read, as follows:
4      "That's the cost of goods, so
5      that's what we thought this is going
6      there, there, the cost of goods.")
7      Q.   So in your tax returns was Long
8   Zhu's investment, when he paid the factory in
9   cash, reflected as a cost of goods?
10     A.   Yes.
11     Q.   Do you know if additional stock or
12  shares were issued to Long Zhu when he made
13  this additional payment in order to purchase
14  goods bearing the marks at issue from the
15  factory in China?
16     A.   We don't issue stocks, no.
17     Q.   You know that for a fact.
18     A.   Yeah.
19          And it's only -- not only Long Zhu
20  pay. When -- when -- when we have money in
21  States, we will wire money in to China.
22     Q.   Okay.
23     A.   Like I said, Long Zhu will be the
24  one to figure out where to pay to; if it's
25  not enough, he might take out from his

1   SHI

2   pocket. So we wire money to China, too.
3       Q.  Where in China do you wire money?
4       A.  Where? Guang Zhou.
5       Q.  Okay. To whom do you wire that
6   money in China?
7       A.  Oh, there's a (speaking Chinese).
8   I don't know how to say. It's like a trading
9   companies who taking care of the -- the --
10  the freight charges, and we wired everything
11  to this company.
12      Q.  What's the name of that company?
13      A.  Oh. I don't -- I cannot pull out
14  of my head. I can look it up.
15      Q.  Have you -- has Di Da produced
16  documents reflecting these wire transfers?
17      A.  Yes, we did.
18      Q.  To us.
19      A.  Yes.
20      Q.  All of them?
21      A.  All of them.
22      Q.  Okay. How many email accounts does
23  Di Da have?
24      A.  Bank accounts?
25      Q.  How many email accounts does --

1              A. Shi
2  is.
3      Q.   Yes. I'll -- again, for the
4  record, I am an attorney for the plaintiffs
5  in this case, Coach, Inc. and Coach Services,
6  Inc.
7      A.   Okay. Thank you.
8      Q.   Okay. Ms. Shi, did you ever
9  receive a Notice of Preservation letter from
10 your counsel in this case?
11     A.   I personally have not received this
12 letter.
13     Q.   Have -- you've personally not seen
14 it.
15         Have you received it through
16 someone else?
17         I mean what do you mean, you've
18 personally not seen -- not received it?
19     A.   I have not seen this letter.
20     Q.   Okay. Do you know if anyone else
21 within Di Da has received a Notice of
22 Preservation letter?
23     A.   I don't know.
24     Q.   Have you ever been told that you
25 have an obligation to preserve evidence in

1  A. Shi
2  this case?
3  A. Not to disclose?
4  Q. Not to destroy.
5  A. No.
6  Q. Okay. Have you ever been told
7  because of the litigation, you need to make
8  sure that all materials and documents are
9  maintained?
10 A. No.
11 Q. Do you know if anyone else within
12 Di Da has been told this?
13 A. I don't know.
14 Q. Is it a fair statement to say that
15 if your counsel were to tell you this or to
16 tell Di Da this, it would have been told
17 through you?
18 A. Di Da, from the corporation? What?
19 Q. Let me ask it another way.
20 A. Okay.
21 Q. Are you the person primarily
22 responsible for communicating with Di Da's
23 counsel?
24 A. Yes.
25 Q. And you were in the deposition

1    A. Shi
2    yesterday with Long Zhu, and he said in fact
3    that you are the person who -- who contacts
4    Di Da's counsel when necessary, correct?
5        A.   Correct.
6        Q.   So if Di Da's counsel would have
7    informed Di Da that it had a duty to preserve
8    evidence, that would have been communicated
9    to you, correct?
10       A.   Correct.
11       Q.   All right.  And no such
12   communication has ever been -- been given to
13   you or told to you.
14       A.   Correct.
15       Q.   So yesterday do you recall Long Zhu
16   testifying to the fact that prior to your
17   deposition in August of 22nd -- August 22nd,
18   you had not spoken with him?
19       A.   I did not talk to him, correct.
20       Q.   Okay.  But during your August 22nd
21   deposition you testified in preparation for
22   your dep that you had spoken with all the
23   necessary parties.  Do you recall testifying
24   to that?
25       A.   I don't remember.

1    A. Shi
2    materials being deleted off the computer's
3    hard drive?
4    A.   I don't know that.
5    Q.   All right. Are you surprised to
6    know that documents -- that -- that the
7    computer has been tampered with?
8         MS. SHIELDS:  Objection.
9    A.   I wasn't surprised.
10   Q.   You -- you were not surprised.
11   A.   Correct.
12   Q.   Why were you not surprised?
13   A.   This is his computer.
14   Q.   Did you do -- after -- after your
15   conversation, or -- excuse me. After the
16   deposition in August, how long between that
17   point and when the computer was delivered to
18   the -- to your counsel, how long did it take?
19   A.   So when I knew that I had to
20   provide the computer.
21   Q.   When was that?
22   A.   It's around October, correct.
23   Q.   So two months after your deposition
24   you were informed that you needed to provide
25   the computer.

1   A. Shi
2   we had been continuing to sell these on July
3   or August of 2012.
4       Q. How did you -- how did you go about
5   creating this spreadsheet?
6           (Cell phone interruption.)
7           THE INTERPRETER: I'm sorry. Can I
8   take one minute again?
9           MR. COLE: Sure.
10          THE INTERPRETER: Just one minute.
11          THE VIDEOGRAPHER: The time is
12  6:52 p.m. and we're going off the
13  record.
14          (Discussion off the record.)
15          THE VIDEOGRAPHER: The time is 6:54
16  p.m. and we're back on the record. This
17  also begins tape number seven.
18          MR. COLE: Could you read back the
19  last question, please.
20          (Record read, as follows:
21          "How did you go about creating this
22  spreadsheet?")
23      A. I added -- I added up all the
24  invoices one by one.
25      Q. Okay. Where did you get the

1      A. Shi
2  quantity for -- for the products that's shown
3  in the far left column on Exhibit 28?  Where
4  did that quantity come from?  Because that's
5  not listed on the invoices.
6      A.   If there are two, then I add two.
7  If there are three, then I added three.
8      Q.   No.  You -- you did not go through
9  every one of those invoice and come up with
10 these quantities.
11           Is there --
12     A.   Why are you saying this?
13     Q.   How long did it -- how long did it
14 take you to create this spreadsheet?
15     A.   A lot of my time.
16     Q.   How long?
17     A.   One week.
18     Q.   So your testimony here today under
19 oath is that you went through every invoice
20 and you counted up every -- every quantity
21 that was listed on the invoice, and that's
22 how you came up with -- with this column.
23     A.   Yes.
24     Q.   Did you have anyone -- any help?
25     A.   I made it.  I made it.

1        A. Shi
2    Q.  Did you have any help?
3    A.  I remembered perhaps my mom had
4 read it to me -- had read them to me.
5    Q.  Read each invoice to you?
6    A.  Yes. I just copied, and she would
7 read them.
8    Q.  Okay. Are there notes -- where --
9 where -- did you keep notes?
10   A.  No.
11   Q.  Well, how did you track that there
12 are 350 of X product?
13       (Discussion off the record.)
14   A.  At that time, I had them, but after
15 I had calculated them, I had thrown them
16 away.
17   Q.  Okay. So after the litigation
18 ensued, you then threw away the notes related
19 to -- to this -- this specific product -- or
20 this specific issue, you threw the notes
21 away.
22       MS. SHIELDS: Objection.
23   A.  I don't know why the notes would
24 relate to this.
25   Q.  Okay. Is there anything else that

A. SHI

1
2       interject.
3               It's not just my younger
4       brother's name.  There's also Sam's
5       younger brother's name.
6       Q.      And who is that?
7       A.      Li Zhu.
8               INTERPRETER:  L-I, Z-H-U.
9       Q.      Was the decision to transfer or
10      to assign the rights to certain trademarks
11      and word marks -- or trademark designs and
12      word marks, was that a collective decision or
13      was that just you and Sam talking?
14      A.      Well, my uncle and my mother were
15      both aware of it, also, because it was not a
16      big deal.
17      Q.      So, when your uncle testified
18      yesterday or the day before -- excuse me --
19      that he didn't know anything about the
20      U.S.P.T.O. trademarks or the U.S.P.T.O.
21      Application for the trademarks, that
22      untruthful, wasn't it?
23              MS. SHIELDS:  Objection.
24      A.      That's incorrect.
25      Q.      Why is that "incorrect"?

1                    A. SHI
2       A.      Three-D.
3       Q.      I'm sorry?
4               INTERPRETER:  "D."
5       A.      Three-K.  Three I.  And 3-H.
6       Q.      That's all?
7       A.      That's it.
8       Q.      When did you assign the word mark
9   and Trademark that's identified on Exhibit
10  3-D?
11      A.      Around April -- August.
12      Q.      Of 2014 or 2013?
13      A.      Fourteen.
14      Q.      And who did you assign that one
15  to?
16      A.      Huida Shi.
17              INTERPRETER:  H-U-I-D-A, S-H-I.
18      A.      And Li Zhu.
19              INTERPRETER:  L-I, Z-H-U.
20      Q.      And you did that after speaking
21  with Sam Zhu?
22      A.      He had talked about it all along.
23  I only did it, set it in motion, at that
24  time.
25      Q.      When did Sam Zhu first talk about

Page 490

1       A. SHI

2   it with you?

3       A.   Around the beginning of 2014.

4       Q.   Why did it take you -- or why did

5   you delay in filing the Assignment paperwork?

6       A.   Because I didn't take him

7   seriously.

8       Q.   What changed? Why did you begin

9   to take him seriously?

10      A.   Well, because it so happened that

11  I had time that day and it so happened that

12  he brought it up that day. So, I thought,

13  oh, let me just assign it.

14      Q.   Okay. But you said that you

15  weren't taking him seriously.

16           And I'm asking: What changed to

17  make you, all of a sudden, take Sam seriously

18  about assigning this particular word mark and

19  trademark?

20      A.   Well, because he mentioned it a

21  few times. Then I realized he was serious.

22      Q.   Was anyone else involved in those

23  discussions with you, regarding the transfer

24  or the Assignment of the Trademark?

25      A.   No. I didn't really discuss it

Page 491

1  A. SHI
2  with anyone.
3  Q. Other than Sam?
4  A. Correct.
5  Q. Let's just be clear. You didn't
6  really discuss it with anyone or you did not
7  discuss it with anyone?
8  A. When I think about it, I did not
9  mention it to anyone.
10  Q. Did you mention it to Sam?
11  A. Well, yes. Because he mentioned
12  it to me. He asked me to assign them.
13  Q. And do you have documentation
14  regarding the Assignment for this Trademark
15  that's shown on Exhibit 3-D?
16  A. Yes.
17  Q. Okay. Have you provided that
18  documentation to your counsel?
19  A. No.
20  MR. COLE: Counsel?
21  I would ask that those documents
22  be produced.
23  Q. How about 3-K? You identified
24  3-K as another Trademark that you recently
25  assigned; correct?

1  A. SHI
2  me -- did you submit that Assignment for both
3  your brother and your cousin, or one, or the
4  other?
5      A.     Yes, both.
6      Q.     And you stated earlier that you
7  submitted some of this documentation on-line.
8  Did you submit this on-line, as well?
9      A.     Yes.
10     Q.     Is there any particular reason
11 why, the trademarks that we're discussing,
12 why these were selected versus the others
13 that you stated and testified have not been
14 assigned? Is there any reason why those
15 particular ones were chosen?
16     A.     I am just -- I just know about
17 these four. I don't know about the others.
18     Q.     Right. But did you say to Sam,
19 well, do you want me to assign all of our
20 trademarks, or only -- you know, why only
21 these; not the rest?
22     A.     I did not ask Sam that.
23     Q.     Did Sam tell you?
24     A.     He did not go -- he was -- he did
25 not go into any details, either.